# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO: 17-390 |
| SCOTT ALLINSON | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### I.    INTRODUCTION

The United States of America, by its attorneys, William M. McSwain, United States Attorney for the Eastern District of Pennsylvania, and Anthony J. Wzorek and Michelle L. Morgan, Assistant United States Attorneys for the District, hereby files a sentencing memorandum in the above captioned case.

On March 1, 2018, after a six-week trial, a federal jury convicted defendant Scott Allinson of conspiracy to commit bribery, in violation of 18 U.S.C. § 371, and bribery/offering, in violation of 18 U.S.C. § 666(a)(2). The trial evidence demonstrated that defendant Allinson and others engaged in a bribery scheme with the Mayor of Allentown to trade campaign contributions for legal work with the City of Allentown.  This type of corrupt conduct undermines an important foundation of our democracy – public trust.  When public officials and private citizens violate the public trust in this way, it engenders cynicism and apathy in local government. In view of defendant's blatant, greed-driven role in the corruption scheme, this Court should impose a sentence of imprisonment to punish the defendant and deter others from engaging in "pay-to-play" corruption. The Court has scheduled sentencing for June 29, 2018.

II.     <u>**EVIDENCE IN SUPPORT OF THE CHARGE**</u>

      The government detailed the evidence against defendant Allinson and others involved in the corrupt scheme in its response to the defendant's Rule 29 and Rule 33 motions. The government incorporates the facts set forth in its response into this memorandum. As highlighted in the factual summary, the defendant -- unaware that agents were recording him-- revealed himself to the jury and to this Court with his own words.  Allinson's words – unvarnished, raw, and explicit—exposed his corrupt intent and greedy motive.  He was not a passive participant in pay-to-play.  His language and action showed corrupt activism.

<u>**Allinson Promoted the Corrupt "Dialect" with Pawlowski**</u>

      On December 10, 2014, Allinson, aware that the Mayor had withdrawn legal work from one attorney at his firm, Norris McLaughlin, and given the work to another firm that had been a prolific campaign contributor, let Sam Ruchlewicz, the Mayor's political operative, know that such action undermined his efforts to raise campaign contributions for the Mayor from the attorneys at Norris McLaughlin.  Allinson told Ruchlewicz, "This is really delicate, but I gotta talk our dialect of English, Sam." After explaining how the city solicitor had a professional relationship with the Norris McLaughlin attorney and been instrumental in steering work toward the attorney, Allinson reminded Ruchlewicz that he personally had "run point" for Pawlowski whenever he needed something. Allinson said that it was embarrassing when the Mayor gave the work to another firm and put him in an awkward position when he tried to raise contributions for the Mayor. "I'm not able to rally my troops with their checks," Allinson emphasized.

      When Ruchlewicz, the Mayor's political consultant, pressed Allinson on the importance of giving something to the Mayor despite the awkward circumstances, Allinson

responded: "I know that …but the well is completely dry right now and so I'm just talking our dialect of English that, you know, we've been unbelievably supportive in the past and now, you know, the work's going everywhere but, but to our shop."  Nevertheless, Allinson previewed a profitable relationship between the Mayor and the firm moving forward: "This is a short term fixable issue."

Moving forward, Allinson made clear that he was aware of how the pay-to-play worked.  On March 25, 2015, he told Michael Fleck, Mayor Pawlowski's political consultant, that if he was cut out of the Allentown work credit, he would tell people in his firm that the Mayor referred work to approximately fourteen law firms, and if they wanted to receive city work, they had to work with Fleck and Ruchlewicz and cobble some money together. Recognizing that the campaign contributions controlled the corrupt relationship, rather than the quality of the legal work, he added, "This isn't like we're being hired because we are good guys. It's not the way this shit works. I don't care how good you are."

**Allinson Stood to Benefit from the Corrupt Relationship**

In numerous secretly recorded conversations, Allinson revealed his personal financial stake in the corrupt bond he formed with Pawlowski, Fleck, Ruchlewicz, and others in the pay-to-play conspiracy.

In a February 3, 2015 conversation with Fleck and Ruchlewicz, Allinson made a pitch about having all of Allentown's legal work for Norris McLaughlin funneled through him. "If I get a hundred percent of the kind of credit that turns into money, that goes out of my checkbook where you want it to go. So, if it [work] comes to me and I get billing credit, then I get the full stack of cash on the one side to do with it what I need to do, annually. Do you know

what I'm saying to you? If it goes to anybody other than me, it will get fucked up." Later in the

conversation, Ruchlewicz and Allinson nailed down the quid pro quo. Ruchlewicz told Allinson

that the contribution the Mayor wanted was $10,000 for the year. Allinson said "that's easy,"

then asked "If . . . what is going to happen?" Ruchlewicz answered "All the work will come to

you. The work will be yours."

Pawlowski's political consultants reinforced this understanding in other

conversations with Allinson. For example, in a December 12, 2014 conversation, when

Ruchlewicz gave Allinson advance word that the Mayor was considering a Norris McLaughlin

attorney for the parking authority's solicitor position, Ruchlewicz said Allinson would get credit

for it. Allinson acknowledged this point in a January 22, 2015 conversation when he told

Ruchlewicz that if Ruchlewicz succeeded in securing the parking solicitor position for the Norris

McLaughlin lawyer, Ruchlewicz would get "the golden goose."

Pawlowski confirmed his understanding of Allinson's personal financial stake and

the importance of Allinson in the corruption scheme in a March 31, 2015 secretly recorded

conversation. Pawlowski told Ruchlewicz that he was still working on the parking authority

solicitor position for the Norris McLaughlin attorney. He also confirmed that the information

regarding the job was going to go through Allinson. Ruchlewicz emphasized that it was

important that it went through Allinson because Allinson controlled the PAC money and he had

to "quantify it to the thing so when they, you know, take the deductions out for the PAC, that it

goes in so we can request money." Pawlowski responded "Gotcha." Ruchlewicz repeated: "It's

very, very important that Scottie gets that call so he can do the internal deductions. So that when

we call Scottie there's money in the little fund."  Pawlowski said, "I got you," and Ruchlewicz

continued: "Otherwise we get two hundred and fifty dollar checks and the whole world goes boom."

### Allinson as the Link Between Contributions and Legal Work

In a January 6, 2015 conversation, Allinson reacted positively to news that the Norris McLaughlin attorney would get the parking authority position. When Ruchlewicz told Allinson the Parking Authority solicitorship was moving along nicely and should be in place in 30 to 45 days, Allinson confirmed that he would be contributing $2,500 to Pawlowski in late January 2016.  A February 13, 2015 conversation between Pawlowski and Ruchlewicz showed that Allinson wanted the Mayor to know about his contribution. Ruchlewicz told Pawlowski that Allinson said that he understood that he had to show up at the Mayor's Mardi Gras fundraiser and brought a check to the party. According to Ruchlewicz, Allinson instructed him to make sure that the Mayor knew he had brought the check. Ruchlewicz told Pawlowski that "installment #1" is here so we can continue with the plan to appoint the Norris McLaughlin attorney to the solicitor's position. After a pause, Pawlowski said "Good."

Allinson continued to promote a link between political contributions and city business by arranging a meeting between Pawlowski and attorneys at Norris McLaughlin.  On May 20, 2015, a sit-down meeting occurred between Pawlowski, Fleck, Allinson, and Matthew Sorrentino, the chairman of Norris McLaughlin. Pawlowski asked the firm to raise $25,000 before June 30th. Sorrentino said that he had to hit up a couple of other people, but that it was doable. Allinson then started talking about the problem of having clients and friends of the firm who were Republicans. Pawlowski suggested that those people can simply provide him $2,700 for the primary alone and sit out the general election. As he said, "in the primary I am running

against Sestak, not Toomey." Sorrentino then said, "For us, for our relationship with the city, and from a legal work standpoint, that's a really good talking point."

Fleck asked shortly thereafter "if there was anything you guys need from us?" Allinson told Fleck that they have to catch up real soon. Sorrentino asked whether the Mayor had taken action on behalf of a firm client, JG Petrucci. Sorrentino asked Pawlowski if he was able to obtain funding for Talen Energy, which evidently was thinking about relocating to Phillipsburg, New Jersey. JG Petrucci, a developer, was looking to develop property in the Neighborhood Improvement Zone in Allentown and hoped that Talen would occupy the property as a tenant. Sorrentino represented JG Petrucci and inquired of Pawlowski about the funding from NIZ taxes. Pawlowski explained how he had discussed this issue with Governor Wolf and Katy McGinty and they evidently agreed that the money would be certified.

At trial, Sorrentino testified that as the meeting was ending, Allinson asked him (Sorrentino) to ask other attorneys at Norris McLaughlin to donate to Pawlowski's campaign.

In conversations following the meeting, Pawlowski made clear his interest in keeping Allinson happy and in the loop on getting the parking authority solicitor position for an attorney at Norris McLaughlin. On June 16, 2015, Pawlowski told Fleck that the Norris McLaughlin attorney under consideration for the position,  had been writing him directly about the solicitorship.  Pawlowski suggested that Fleck call Allinson about this. Fleck said that "I think we made things abundantly clear on the timeline for things." On June 17, 2015, Fleck called Allinson and told him that although he knew that Allinson could deal with the internal politics of his office, and that the solicitorship would go through Allinson, he wanted Allinson to know that Rich Somach had called Pawlowski asking when he was going to be appointed. Fleck

said that Pawlowski told Somach that the deadline was June 30th and that he was working with Allinson and Sorrentino.

Poignantly, the status of the appointment came up as Fleck and Pawlowski discussed campaign contributions. On June 29, 2015, Fleck and Pawlowski went through the list of contributors that they may need to call, Fleck told Pawlowski that Sorrentino came through with $17,300 of the pledged $20,000 and had promised to provide the additional $2,700. Fleck asked if they could now appoint Somach to the solicitorship of the Parking Authority. Pawlowski said it was not that easy as he was not allowed in the Parking Authority board meetings. They discussed another way to get the current solicitor to withdraw by telling Lehigh County Executive Muller about his conflict.

All of the above facts demonstrate not only that Allinson willingly engaged in a pay to play scheme, but did so actively and wholeheartedly. He was a significant facilitator and beneficiary of the scheme, and the seriousness of his offense is reflected in the sentencing guidelines calculations.

## III.   SENTENCING CALCULATION

The statutory maximum sentence that the Court may impose on defendant Allinson based on his conviction on Count One (conspiracy) and Count Nineteen (federal program bribery) is 15 years imprisonment, three years supervised release, a $500,000 fine, and $200 special assessment.

The United States Probation Department has calculated the defendant's total offense level as 18. To arrive at this calculation, the Probation Officer used the base offense level of 12 pursuant to USSG §2C1.1(a)(2). The base offense level is increased by four levels pursuant

7

to USSG §2C1.1(b)(3) because the offense involved an elected official (defendant Pawlowski) with high-level decision-making authority. Section 2C1.1(b)(3) also states that if the resulting offense level is less than level 18, increase to level 18. With a total offense level of 18 and a Criminal History Category I, defendant Allinson faces a guideline sentencing range of 27 to33 months' imprisonment.

## IV.   <u>ANALYSIS</u>

The Supreme Court has declared:  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall v. United States</u>, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in 18 U.S.C. § 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

**Consideration of the 3553(a) Factors.**

**(1)** **The nature and circumstances of the offense and the history and characteristics of the defendant.**

As reflected in his own language, Allinson's actions were blatant, clearly proposing to trade campaign contributions for work with the City of Allentown. His actions were especially pernicious because he essentially was helping to support a candidate for the United States Senate, a candidate he knew could be bought and sold by someone just like him. His actions also were harmful as they were the kind of actions that make most ordinary citizens distrust their own public officials and their own government. As such, the ultimate impact of his actions are immeasurable but deleterious to our system of government.

Allinson's actions were also inexcusable. When one considers the amount of money that Allinson was making at the time, as reflected in the PSR, it is clear that the defendant was not motivated by anything but pure greed. The PSI states that in 2014 and 2015, the times most relevant to the charges in the indictment, Allinson declared income of $444,964 and $733,851 respectively. Despite these substantial amounts of money, and having many of the accoutrements that come with a high income, the defendant was quite ready to engage in a bribery scheme with an elected public official. The fact that he was a lawyer, subject to a strict code of professional ethics, makes his actions all the more egregious and all the more inexcusable.

Allinson was not a victim here. He knew how to play the "pay to play game" and engaged in it willingly. He made his intentions quite clear to Pawlowski's political operatives so that they would deliver his message to Mayor Pawlowski. Knowing the strong desire of Pawlowski to raise money for his Senatorial campaign by June 30, 2015, Allinson teased

9

Pawlowski that he might not give him any money at all considering the lack of work flowing to Norris McLaughlin from the city of Allentown. But ultimately Allinson's terms of engagement were quite simple: work to the law firm flows through me so that I get credit for it, and I will make campaign contributions to the Mayor.

(2)   **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

(3)   **The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

The public has a right to expect that its public officials, and all who interact with them, will conduct themselves in a fair and honest way when engaged in municipal business. This expectation should only become all the more acute when lawyers are the people interacting with the public officials.

The public also has a right to expect that all business conducted by the city serves to benefit the community as a whole and not to benefit the public official and his rich friends. When these expectations are dashed in a corrupt scheme such as the present one, it is the community as a whole that is injured and the concepts of honesty in government and respect for the law that are ridiculed. The offense is a serious one and the punishment must also be serious.

This case also calls out for clear general deterrence. Every public official giving out governmental contracts and every businessperson seeking work from local, state, and federal governments must see that the consequence for engaging in a bribery scheme is a serious period of imprisonment. Because of the high profile nature of this prosecution, this Court's sentence speaks to the citizens of the Commonwealth of Pennsylvania and beyond. "Pay to play" has been a particular scourge in this area. The right message must be sent.

**(4)** **The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

The defendant did not report any long-term illness or physical disability to the Probation Officer.  He disavowed any history of mental illness or clinical diagnosis of a psychological disorder and no contrary information concerning his mental health was discovered during the Presentence Investigation. The defendant has been employed since at least 1986.

**(5)** **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

The only two defendants sentenced so far in the Allentown cases are:

James Hickey pled guilty to one count of honest services mail fraud and one count of honest service wire fraud. Hickey's suggested sentencing guidelines range was 18-24 months' imprisonment, and he received a "C" plea for 18 months' imprisonment.

Patrick Regan pled guilty to one count of conspiracy to commit mail and wire fraud and had a suggested sentencing guidelines range of 0-6 months imprisonment. He received a two-year period of probation.

There are distinctions between Regan and Hickey on the one hand, and Allinson, on the other. When confronted with the audacity of their crimes, Regan and Hickey, ultimately acknowledged their culpability. Allinson chose a different path and should receive a more severe sentence.  Moreover, Regan and Hickey were not active lawyers.  Allinson, as an active, practicing lawyer, held a special position of responsibility to the profession. Engaging in this corrupt behavior requires an appropriately higher sentence.  A sentence within the 27 to 33 month guideline range would be appropriately higher.

11

**(6)**     __The need to provide restitution to any victims of the offense.__

Restitution is not at issue in this case.

**V.     GOVERNMENT'S RECOMMENDATION**

After considering the factors of 18 U.S.C. § 3553(a), the government recommends a guideline sentence of imprisonment. The government submits that anything less than a guideline sentence minimizes the actions of the defendant and the serious nature of his offense.

The government also recommends that the Court remand defendant Allinson to the custody of the U.S. Marshals immediately following the sentencing. Title 18, United States Code, Section 3143(a), provides as follows:

(a)     Release or Detention Pending Sentence

Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).

Based on this statute, to be released pending execution of sentence, the defendant must prove by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or the community if released.

The defendant cannot sustain his heavy burden of proof here. Since the beginning of this case, the defendant has never accepted the seriousness and the illegality of his conduct and evidently has believed that he would be acquitted or receive little or no jail time. Having been in denial, even in the face of his own tape-recorded conversations in this case, the defendant now has an incentive to flee. Unlike most defendants, he also has the means to effectuate flight.

12

For that reason, the government recommends immediate remand.

**Respectfully submitted,**

**WILLIAM M. McSWAIN**
**United States Attorney**

**s/Anthony J. Wzorek**
**ANTHONY J. WZOREK**
**MICHELLE L. MORGAN**
**Assistant United States Attorneys**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been filed on ECF and thus served upon:


      William J. Winning, Esq.
      Megan Susan Scheib, Esq.
      1650 Market Street
      Suite 2800
      Philadelphia, PA 19103


                    s/Anthony J. Wzorek
                    **ANTHONY J. WZOREK**
                    **Assistant United States Attorney**


Date:   June 21, 2018.

14