IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 17-390-2 |
| | : | |
| SCOTT ALLINSON | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                         **July 30, 2018**

On March 1, 2018, after a six-week jury trial, Defendant Scott Allinson was convicted of one count of conspiracy and one count of federal program bribery for his role in a pay-to-play scheme orchestrated by former Allentown Mayor Edwin Pawlowski, Allinson's co-defendant. At the close of the Government's case, and again at the close of all evidence, Allinson moved for judgment of acquittal on both counts pursuant to Federal Rule of Criminal Procedure 29, arguing the Government's evidence at trial was insufficient to convict him. The Court reserved ruling on the motion. Following the verdict, Allinson filed a motion for new trial pursuant to Federal Rule of Criminal Procedure 33, arguing the verdict was against the weight of the evidence, the Government's closing argument improperly urged the jury to apply the incorrect legal standard, and the Government's proof at trial went beyond the allegations in the Indictment, resulting in a constructive amendment. By Order of June 29, 2018, this Court denied Allinson's Rule 29 and Rule 33 motions. Pursuant to Third Circuit Local Appellate Rule 3.1, the Court issues this Memorandum to summarize the basis for its rulings.

## BACKGROUND

On July 25, 2017, Allinson, Pawlowski, and a third Defendant, James Hickey, were charged by indictment with corruption-related offenses arising out of Pawlowski's pay-to-play scheme in the City of Allentown, in which Pawlowski was alleged to have accepted over

$150,000 in campaign contributions in exchange for the use of his official position. Allinson, an attorney, was named in two counts of the 55-count Indictment, in which he is accused of trying to direct city legal work to his law firm in exchange for the promise of campaign contributions. Count One charged him with conspiracy to commit federal program bribery, in violation of 18 U.S.C. § 371, and Count Nineteen charged him with the substantive offense of federal program bribery, in violation of 18 U.S.C. § 666(a)(2).

Allinson and Pawlowski proceeded to trial in January 2018.[1]  At trial, the centerpiece of the Government's case against Allinson was a series of recorded conversations between Allinson and two of Pawlowski's operatives—Michael Fleck, Pawlowski's campaign manager, and Sam Ruchlewicz, who worked for Fleck.  In the recordings, which spanned from December 30, 2013, to June 29, 2015, the parties unmistakably discussed plans to funnel legal work from the City of Allentown to Allinson's law firm (Norris McLaughlin) and to ensure that Allinson received origination credit for the work, in exchange for campaign contributions from Norris McLaughlin to Pawlowski.  The Government also introduced recordings of conversations between Pawlowski and his operatives, demonstrating Pawlowski's awareness and involvement in this pay-to-play scheme.

The recordings reveal Allinson's view that Pawlowski could expect campaign contributions from Norris McLaughlin only in exchange for legal work for the City.  On December 10, 2014, for example, Allinson complained to Ruchlewicz that members of his law firm were disappointed that Pawlowski had given a City legal matter to another law firm, and he explained that as a result, he was not in a position to "rally [his] troops with their checks," *see*

---

[1] Hickey pled guilty to a single count of the Indictment prior to trial, in December 2017.

Gov't's Ex. SR21183T at 2.[2]  Allinson repeatedly stressed to Ruchlewicz that he was "just talking [their] dialect of English," adding that his firm had "been unbelievably supportive in the past" but that "now, you know, the work's going everywhere but [] to [their] shop," and reported that this was "a short[-]term fixable issue." *Id.* at 3.

Two days later, on December 12, 2014, Ruchlewicz informed Allinson that the current solicitor for the Allentown Parking Authority was going to be terminated from employment and Richard Somach, a partner in Allinson's firm, would receive the appointment. *See* Gov't's Ex. SR21602T at 1-2.  Ruchlewicz further explained that the appointment would go through Allinson to ensure that Allinson received origination credit for the work.  *Id.* at 2.  Ruchlewicz then stated, "I need you guys to do something for the mayor's holiday party," to which Allinson responded, "Here's what we're gonna do. . . . I'll speak, I'll speak our dialect of English" and expressed willingness to be a sponsor for Pawlowski's holiday party and to write a check for $2,500 after January. *Id.* at 3.

A month later, on January 22, 2015, Ruchlewicz told Allinson he had solved Allinson's "[P]arking [A]uthority problems," and Allinson responded, "If you solve that problem, you get the golden goose."  Gov't's Ex. SR286T at 1.  When Ruchlewicz then stated that Fleck and Pawlowski wanted Allinson's help raising money for Pawlowski's United States Senate campaign, Allinson agreed to do so, saying, "Well of course I am going to raise money."  *Id.* at 3.[3]  The next day, at a breakfast meeting, Ruchlewicz said, "Umm, so our particular brand of

---

[2] For ease of reference, citations to the recorded conversations are to the transcripts of those conversations rather than to the audiotapes themselves.  Although the transcripts were not admitted into evidence, they were used during trial as aids, and their accuracy is not contested.

[3] After Allinson had agreed to be a sponsor for Pawlowski's holiday party, on January 30, 2015, Ruchlewicz informed Pawlowski that he had a strange meeting with Allinson concerning his fundraising and proposed meeting with Susan Wild, the current City solicitor, to discuss

English." *See* Gov't's Ex. SR287T at 1. He then told Allinson that he and Fleck had talked to Pawlowski and informed him that all legal work given to Norris McLaughlin would go through Allinson. *See id.*

The following week on February 3, 2015, Allinson explained to Fleck that if he were to receive a phone call requesting that he oversee the Allentown Parking Authority solictorship, then he would "get a hundred percent of the[] kind of credit that turns into money that goes out of [his] checkbook where [Fleck and Ruchlewicz] want it to go." Gov't's Ex. SR301T at 5. Allinson elaborated: "If it comes to me and I get the billing credit, then I get the full stack of cash on my side to do with it what I need to do, annually." *Id.* at 6. Allinson then represented that Matthew Sorrentino, the chairman of Norris McLaughlin, would be cooperative in ensuring that contributions were made to Pawlowski, explaining: "Matt and I have always spoken[] the same language. . . . Matt and I control the flow of political donations." *Id.*

On February 11, 2015, Ruchlewicz asked Allinson to stop by Pawlowski's Mardi Gras fundraiser on February 13, 2015. Gov't's Ex. SR27984T at 2. Allinson confirmed that he would attend the fundraiser and bring a check. *Id.* Ruchlewicz responded, "I love you Scotty, but I love that even more," to which Allinson replied, "Yeah, I understand. That's the way it works." *Id.* Ruchlewicz then told Allinson that Pawlowski had taken care of all of Allinson's problems, and said he had told Pawlowski that Norris McLaughlin loved him and that "everything was gonna work out, and we have to keep giving Scotty all the things that Scotty loves." *Id.*

---

continuing to do work for the City. *See* Gov't's Ex. SR296T at 1. When Pawlowski heard this news, he exclaimed, "Really! . . . I've given him[] millions of dollars." *Id.* Ruchlewicz told Pawlowski that Fleck was "fixing it." *Id.* Pawlowski remained upset and stated, "You know, fuck them! And I'm not gonna put, I'm not gonna make Somach solicitor or anything. Screw it all." *Id.* at 2. Later that day, Pawlowski asked Fleck and Ruchlewicz, "Are you gonna light up Allinson? I don't have to do it? . . . Because that really pisses me off." Gov't's Ex. SR297-1857T at 1. Fleck and Ruchlewicz told him that they would take care of it. *Id.* at 2.

Allinson asked about Pawlowski's response, and Ruchlewicz stated, "He was like well, he's like yeah, good, as long as it's all worked out. He's like, I'm happy to support Scott. He's like, I always have. He's like, we've given him lots of stuff and we want to continue to do that." *Id.* at 3. Allinson responded "Cool, alright, we'll make all that happen." *Id.*

Two days later, on the day of the Mardi Gras fundraiser, Ruchlewicz met with Allinson and told him that he had spoken to Allentown City Manager Francis Dougherty, and that the Parking Authority contract was going to go to Allinson: "It's gonna go to you. The email will come to you. It's gonna say Scott[y], we'd really like Norris to come in, and the attorney we were thinking about is Rich Somach. The first email will come to you. Then and after that you can do whatever you have to do on your end." Gov't Ex. SR318T at 4. Allinson stressed to Ruchlewicz that he needed to get financial credit for the parking solicitor work assigned to Norris McLaughlin. *See id.* at 5-6 ("[W]hen the fish comes in off the boat . . . [i]f you're not holding the fishing rod, you're not gonna get financial credit in our internal system."). Ruchlewicz assured Allinson he would be taken care of: "[Y]ou know what the [M]ayor cares about. . . . And the [M]ayor's got plans. He's got to raise money. So as long as checks come in, I can go to Ed and say, look, [M]ayor . . . Norris has held up their end of the bargain . . . [w]e need to hold up ours." *Id.* at 6-7. Ruchlewicz concluded the conversation by stating the "machine is going" and "[e]verybody understands what has to be done." *Id.* at 7. Later the same day, after the fundraiser, Ruchlewicz informed Pawlowski that Allinson showed up to the event with a check[4] and said, "Installment number one is in." *Id.* Ruchlewicz also recounted his conversation with Allinson in which Allinson told him to make sure Pawlowski knew he had brought a check. *Id.* Ruchlewicz told Pawlowski that he had told Allinson they could continue

---

[4] Allinson made this $250 check payable to Pawlowski's campaign committee, "Friends of Ed Pawlowski." *See* Gov't Ex. K10.

with the "Somach to solicitor plan." *Id.* Pawlowski noted his approval, responding, "That's good." *Id.*

Approximately one month later, on March 25, 2015, in a discussion with Fleck and Ruchlewicz about getting work from the City for Norris McLaughlin, Allinson acknowledged that the work would be in exchange for campaign contributions, explaining that he would tell his law partner, "If you guys are going to handle the [City] work and deal with all that stuff, you're gonna have to work with [Fleck] and [Ruchlewicz] on . . . cobbling some money together. This isn't like we're being hired because we are good guys, it's not the way this shit works. . . . It just isn't. I don't care how good you are." Gov't's Ex. MF09T at 4.

On April 1, 2015, Pawlowski explained to Ruchlewicz that he was working on getting the Parking Authority solicitorship assigned to Norris McLaughlin. *See* Gov't's Ex. SR365CT at 1. Ruchlewicz stressed that the solicitorship had to go through Allinson even though Somach would do the work because Allinson was the firm's managing partner and controlled the political action committee money. *See id.* at 2. Pawlowski confirmed these terms, responding, "that's logical," and "[g]otcha." *Id.* When Ruchlewicz reiterated that it was "very, very important that Scott[y] gets that call so . . . that when we call Scotty there's money in their little fund," Pawlowski again said, "I got you." *Id.*

Allinson later participated in a sit-down meeting with Pawlowski, Fleck, and Sorrentino—the chairman of Norris McLaughlin—where Pawlwoski made a pitch as to why he would make a good candidate for Senate and asked the firm to raise $25,000 in campaign contributions before June 30, 2015. *See* Gov't's Ex. MF58T at 1-2. Sorrentino, whom Allinson had previously identified to Fleck and Ruchlewicz as "speaking the same language" stated that supporting Pawlowski would be good "from a legal work" perspective. *Id.* at 3. Following this

May 20 meeting, Allinson told Ruchlewicz: "You know, $25,000 is a lot of fucking money when you're getting absolutely zero back from the [C]ity. I mean, I mean when I tell you bone dry, bone fucking dry." Gov't's Ex. SR39323T at 1. Ruchlewicz responded, "Well, we'll have to change that. The [M]ayor will." *Id*. On June 17, 2015, Fleck called Allinson and told him, "I told you about the . . . Somach[] solicitorship. Everything will go through you. It will happen after, you know, the June 30th deadline that we have. But, Somach called Ed yesterday asking when he's gonna be appointed." Gov't's Ex. MF12729T at 1. Ruchlewicz then relayed what Pawlowski had responded to Somach: they have a June 30th deadline, he and Somach would talk after the deadline, and that he was working with Allinson and Sorrentino. *Id*. Allinson said that he would manage whatever he needed to internally. *Id*.

On June 29, 2015, Fleck told Pawlowski that Norris McLaughlin came through with $17,300 in campaign contributions,[5] and Pawlowski responded, "Great. . . . Awesome." Gov't's Ex. MF95-0227T at 1. When Fleck asked if they could now appoint Somach to the Parking Authority, Pawlowski noted that he first needed to get rid of the current solicitor and he didn't control the board's decisions, but that he could talk to the board. *Id*. at 1-2. He and Fleck then discussed another way to get the current solicitor to withdraw. *Id*. at 2.

The Government also presented testimony concerning a trust account, the Trexler Trust, as additional legal work being awarded to Allinson's firm in exchange for campaign contributions. Jerry Snyder, the former solicitor of the City of Allentown, testified that the

---

[5] Somach testified on the Government's behalf, and he was the only Norris McLaughlin attorney to testify in the Government's case-in-chief who donated to Pawlowski's senatorial campaign in June 2015. *See* Trial Tr. Day 14 at 10, Feb. 12, 2018 (hereinafter Trial Tr. Day 14). Somach testified that he never discussed donating with Allinson, but he discussed it with Sorrentino. *See id*. at 41-42. While Somach had never previously donated to Pawlowski, he testified that this race was different because it was national, and he liked how Pawlowski had revitalized the City. *Id*. at 35, 42.

prospect of Norris McLaughlin handling the Trexler Trust matter on behalf of the City with Oldrich Foucek, a Norris McLaughlin attorney, first arose in 2013 or 2014. *See* Trial Tr. Day 14 at 281-82. He further testified that in 2013 or 2014, he recommended to Pawlowski that Judith Harris from Norris McLaughlin handle the Trexler Trust. *Id.* at 283. Susan Wild, the City solicitor from January 2015-January 2018, also testified. She stated that no one directed her to give Allinson or Norris McLaughlin work. *See id.* at 110-11. City Manager Francis Dougherty also provided testimony that Pawlowski had asked him to reach out to Norris McLaughlin concerning the Trexler Trust, and he had identified Judith Harris as someone who could "possibly" assist with the work. *See* Trial Tr. Day 3 at 209-10, Jan. 23, 2018. Dougherty further testified that he had received a message from Ruchlewicz that "all legal work to Norris McLaughlin had to be funneled through a gentleman named Scott Allinson." *Id.* at 210.

Allinson did not testify in his defense, but presented testimony from several fact witnesses, including members from Norris McLaughlin who had donated to Pawlowski in June 2015 following the May 20, 2015, meeting. Attorneys Oldrich Foucek, Charles Smith Jr., and Scott Lipson each testified they made their donations to Pawlowski in June 2015 after Sorrentino, the firm's chairman, asked them whether they would consider donating to Pawlowski's campaign. *See* Trial Tr. Day 16 at 18, 45, 56, Feb. 14, 2018 (hereinafter Trial Tr. Day 16). Foucek testified that he had not spoken to Allinson about his donation. *See id.* at 21. Smith and Lipson testified that they had not spoken to Allinson about their donations either, and they made their donations based on the positive transformation they had witnessed in the City during Pawlowski's tenure. *See id.* at 45-47, 56-57. Sorrentino testified on Allinson's behalf as well, explaining that during the May 20, 2015, meeting with Pawlowski, he told Pawlowski and everyone else present that raising contributions was "doable." *Id.* at 94. He also testified about a

brief conversation he had with Allinson after the May 20 meeting: Allinson asked him if he could "follow through on the Mayor's request to raise some money for the campaign" and alluded he did not want to contribute personally.  *Id*. at 102.  Sorrentino did not have any further conversation with Allinson regarding contributions, and he did not inform Allinson that he or others had agreed to make contributions.  *Id*.  at 105-06.

As to the Trexler Trust, Judith Harris, another attorney from Norris McLaughlin, testified that she never spoke with Allinson about the Trexler Trust matter and that Norris McLaughlin was never retained to represent the Trexler Trust.  *Id*. at 72-73.  Allinson's defense concluded with testimony from several character witnesses.

**LEGAL STANDARD**

In evaluating a sufficiency of the evidence challenge pursuant to Rule 29, a district court must "review the record in the light most favorable to the [Government] to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."  *United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002) (internal quotation marks and citation omitted).  When a court reserves ruling on a Rule 29 motion made at the close of the Government's case, the court must "decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b); *see also United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) ("[T]he District Court was required to, and properly did, determine whether an acquittal was appropriate based solely on the evidence presented by the [G]overnment.").  The court must "review the evidence as a whole, not in isolation," *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010), and should not weigh the evidence or determine the credibility of witnesses, *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998).  So long as there is "substantial evidence, viewed in the light most favorable to the [G]overnment,

to uphold the jury's decision," the court must sustain the jury's verdict. *Brodie*, 403 F.3d at 133 (citations omitted). "[A] finding of insufficiency should be confined to cases where the [Government's] failure is clear." *Id*.

Rule 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When the sufficiency of the evidence is challenged, the Rule 33 standard differs from the Rule 29 standard in that a court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). The court can order a new trial on the ground that the jury's verdict is contrary to the weight of evidence "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (citations and internal quotation marks omitted).

## DISCUSSION

### A. Sufficiency of the Evidence Challenges to Count Nineteen – Federal Program Bribery

Count Nineteen charges Allinson with violating 18 U.S.C. § 666(a)(2), the federal program bribery statute, which is one of several federal anti-bribery statutes. Section 666 criminalizes both the offer and acceptance of a bribe. *See* 18 U.S.C. § 666(a)(1)-(2). As to an offer of a bribe, the statute makes it unlawful for any person to:

> corruptly give[], offer[], or agree[] to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2). Bribery generally requires a "quid pro quo," which is "to give or receive something of value, [the quid,] in exchange for an official act[, the quo]." *United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007) (construing federal bribery statute, 18 U.S.C. § 201, and

holding the same analysis applies "to bribery in the honest services fraud context"). When the alleged thing of value offered in an exchange for an official act is a political contribution, the First Amendment is implicated. *See United States v. Siegelman*, 640 F.3d 1159, 1169 (11th Cir. 2011) (noting that because defendants' bribery convictions were based upon campaign contributions, they "impact[ed] the First Amendment's core values—protection of free political speech and the right to support issues of great public importance"). The Supreme Court has long protected speech in the campaign contribution context based on First Amendment grounds, *see, e.g.*, *Citizens United v. FEC*, 558 U.S. 310 (2010), and in *McCormick v. United States*, 500 U.S. 257 (1991), it held that pursuant to the Hobbs Act, a defendant could be convicted of extorting campaign contributions under color of official right only if the Government has proven an explicit quid pro quo.

Although the Third Circuit has not decided whether proof of a quid pro quo is necessary for a § 666 federal program bribery conviction, *see United States v. Willis*, 844 F.3d 155, 164 (3d Cir. 2016), the parties agree that where the alleged bribe takes the form of a campaign contribution, an explicit quid pro quo is required, *see McCormick*, 500 U.S. at 273 (requiring an explicit quid pro quo for a Hobbs Act extortion conviction in the campaign contribution context); *Siegelman*, 640 F.3d at 1170 n.14 (applying *McCormick* to federal program bribery); *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) (finding extortion under color of official right and bribery are "different sides of the same coin" and concluding "courts should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did in interpreting the Hobbs Act").

"While the quid pro quo must be explicit, it need not be express; political contributions may be the subject of an illegal bribe even if the terms are not formalized in writing or spoken

out loud." *United States v. Menendez*, 291 F. Supp. 3d 606, 624 (D.N.J. 2018) (emphasis omitted). The "relevant inquiry to determine if the Government has met its burden with respect to [bribery] counts" that involve political contributions is "whether a rational juror could find that there was a quid pro quo and that the charged [d]efendant was aware of its terms." *Id.* at 624 (emphasis omitted). The "'jury may consider both direct and circumstantial evidence, including the context [of the arrangement].'" *Id.* (alteration in original) (quoting *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992)).

The Supreme Court recently addressed the "quo" aspect of the quid pro quo requirement in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), narrowing the definition of an "official act" to:

> a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official.

*Id.* at 2371-72.[6]

In support of his Rule 29 motion on the federal program bribery charge, Allinson argues there is insufficient evidence from which a jury could find he engaged in any explicit quid pro quo or that Pawlowski engaged in "official acts." In his Rule 33 motion, he argues the verdict is

---

[6] While the *McDonnell* Court interpreted the "official act" requirement under the federal bribery statute, 18 U.S.C. § 201, courts have applied its analysis to other bribery charges. *See, e.g.*, *United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017) (summary order). The parties agree *McDonnell*'s definition of the term "official act" applies to the bribery counts in this case.

against the weight of the evidence. Allinson argues there was no "quid," as he made only one personal contribution to Pawlowski during the relevant time frame—for far less than the amounts requested by Fleck and Ruchlewicz—and he was not responsible for the $17,300 in contributions made by members of his law firm in June 2015.[7] Allinson also argues there was no "quo," as Pawlowski never took any official action or exerted pressure on anyone to award legal work to his firm, including the Parking Authority solicitorship or work relating to the Trexler Trust. Finally, he contends that neither he nor his firm received any legal contract work from the City of Allentown during the relevant time period.

The Court disagrees. From Allinson's actions and express words, the jury could find a "quid"—i.e., that Allinson gave, agreed to give, or caused others to give campaign contributions to Pawlowski. First, the jury could find Allinson gave a contribution based on the $250 check he dropped off at Pawlowski's Mardi Gras fundraiser in February 2015 and his instruction to Ruchlewicz to inform Pawlowski of that contribution. While Allinson argues that this donation was not evidence of any agreement because Fleck and Ruchlewicz were asking him to contribute much greater sums of money than he actually donated, the jury could still find his $250 donation—which Ruchlewicz described to Pawlowski as "installment one," enabling the parties to continue with the "Somach to solicitor" plan—sufficient to bribe Pawlowski.

Second, the jury could find that Allinson agreed to make contributions to Pawlowski based on Allinson's express words. While stating that he spoke the same language as them, controlled the flow of political donations at his law firm, and understood how "this shit" worked, Allinson repeatedly assured Fleck and Ruchlewicz that he would help raise campaign

---

[7] Allinson also argues evidence of his contributions to Pawlowski in 2011, 2012, and 2013 are irrelevant because the Government failed to offer any evidence tying these contributions to the charges in the Indictment.

contributions for Pawlowski in exchange for legal contract work from the City, including the Parking Authority solicitorship. And third, the jury could infer that Allinson caused other members of his law firm to donate based on the circumstances in which these contributions were made: On June 17, 2015, after the May 2015 meeting where Pawlowski solicited campaign contributions from Norris McLaughlin and less than two weeks before Pawlowski's June 30, 2015, deadline for the receipt of campaign contributions, Fleck called Allinson to inform him that Somach had called Pawlowski to ask when he would be appointed solicitor. Fleck then told Allinson that Pawlowski had responded by telling Somach that the deadline was June 30, they would talk after the deadline, and that he was working with Allinson and Sorrentino. Allinson responded that he would manage whatever was necessary internally. On June 29, Ruchlewicz reported to Pawlowski that Norris McLaughlin had donated $17,300 in campaign contributions. The proximity of these events combined with Allinson's statement that he and Sorrentino spoke the "same language" and controlled the flow of political donations from the firm, and Somach's testimony that he spoke to Sorrentino about donating to Pawlowski in June 2015 are all facts from which a jury could infer that Allinson caused other members of his firm to donate.

As to the "quo" component of a quid pro quo, a reasonable jury could find the Parking Authority solicitorship as an "official act" under *McDonnell*. 136 S. Ct. at 2371 (explaining that an official act requires (1) a "question, matter, cause, suit, proceeding or controversy"; and that (2) a public official "make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy'"). Here, the "matter" before Pawlowski was the Parking Authority solicitorship. While Pawlowski never took action to award Norris McLaughlin the Parking Authority solicitorship, under Supreme Court precedent, a "public official is not required to actually make a decision or take an action on a 'question, matter, cause, suit, proceeding, or

controversy; it is enough that the official agree to do so.'" *Id.* at 2370-71 (citing *Evans v. United States*, 504 U.S. 255, 268 (1992)). From Pawlowski's conversations with Fleck and Ruchlewicz, in which he acknowledged and agreed that Somach would receive the solicitorship in exchange for campaign contributions from members of the Norris McLaughlin law firm, a reasonable jury could find that Pawlowski agreed to take official action concerning the solicitorship. In addition, while Pawlowski stated that he did not control the board in charge of the Parking Authority, he said that he could talk to them. The jury could thus find an official act as to the Parking Authority solicitorship from Pawlowski's words.[8]

As the recordings introduced at trial by the Government demonstrated, the terms of the quid pro quo were clear and were affirmed by both Allinson and Pawlowski, through Fleck and Ruchlewicz, time and time again: Allinson would ensure campaign contributions were donated to Pawlowski in exchange for Somach's appointment to the Parking Authority solicitorship, a matter for which Allinson would receive origination credit. *See McCormick*, 500 U.S. at 273. Viewed in the light most favorable to the Government, as the Court must, the Government's evidence is more than sufficient for the jury to have found beyond a reasonable doubt that Allinson entered into an explicit quid pro quo agreement with Pawlowski.

As to Allinson's argument pursuant to Rule 33, the thrust of his argument is that the verdict was against the weight of the evidence because the Government's evidence did not show he engaged in an explicit quid pro quo. Viewing the evidence independently, however, the Court disagrees for the reasons set forth above. The Court is not persuaded a miscarriage of justice occurred in this case.

---

[8] The Court agrees with Allinson, however, that none of the Government's witnesses, recordings, or exhibits connected Allinson to the Trexler Trust work. That work thus cannot be an "official act" from which Allinson's federal program bribery conviction can be sustained.

**B. Sufficiency of the Evidence Challenges to Count One – Conspiracy**

Allinson further argues the Government did not prove the single conspiracy charged in Count One of the Indictment, as it failed to present evidence connecting Allinson as a co-conspirator with many of the alleged conspirators and Overt Acts identified in Count One. Count One alleges Allinson, Pawlowski, Dougherty, Ruchlewicz, Fleck, and other individuals involved in Pawlowski's broad-ranging pay-to-play scheme—including Hickey, Ramzi Haddad, Matthew McTish, Patrick Regan, Garret Strathearn, and Dale Wiles—conspired and agreed to commit mail fraud, wire fraud, honest services fraud, federal program bribery-soliciting, federal program bribery-offering, and Travel Act bribery, *see* Indict. ¶ 31, and describes numerous Overt Acts taken in furtherance of the conspiracy, *see id*. Overt Acts ¶¶ 1-132. These Overt Acts encompass Fleck and Ruchlewicz's efforts to obtain campaign contributions on Pawlowski's behalf in exchange for specific favorable actions from the City of Allentown, including the award of legal services contracts, street light contracts, pool contracts, and other favorable official action. Prior to trial, the Government clarified that, as to Allinson, Count One was limited to conspiracy to commit federal program bribery. *See* Allinson Mot. to Dismiss Ex. A, ECF No. 31.

A defendant is guilty of conspiracy under the federal conspiracy statute if he agrees with another "to commit any offense against the United States, or to defraud the United States," and at least one of the conspirators takes an act "to effect the object of the conspiracy." *See* 18 U.S.C. § 371. To sustain a conspiracy conviction in the Third Circuit, "the [G]overnment must show: (1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy." *United States v. Rigas*, 605 F.3d 194, 206 (3d Cir. 2010) (en

banc) (internal quotation marks and citation omitted). Unlike in the Tenth Circuit, co-conspirator interdependence—i.e., the requirement that all charged co-conspirators' activities must constitute integral steps toward the realization of a common, illegal goal—is not an element of the offense of conspiracy in the Third Circuit. *Compare, e.g.*, *United States v. Baldridge*, 559 F.3d 1126, 1136 (10th Cir. 2009) (listing the conspiracy elements as "(1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent"), *with Rigas*, 605 F.3d at 206 (listing the elements of conspiracy as "(1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy"). "The [G]overnment can prove the existence of a conspiratorial agreement and the knowledge of the defendant with circumstantial evidence alone." *United States v. Whiteford*, 676 F.3d 348, 357 (3d Cir. 2012). Furthermore, "[t]he [G]overnment need only prove that the defendant agreed with at least one of the persons named in the indictment that they or one of them would perform an unlawful act." *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989) ("Failing to prove that all named co-conspirators conspired with the defendant is not fatal to the [G]overnment's case.").

In his Rule 29 and 33 motions, Allinson argues that the Government did not prove he was part of the single conspiracy charged. Relying on *Kotteakos v. United States*, 328 U.S. 750 (1946)—in which the defendants argued and the Court considered a variance argument—and *Kelly*, 892 F.2d at 259—in which the Third Circuit fashioned a balancing test to assess variance arguments—Allinson maintains the Government has not proven that he and *all* of the alleged co-conspirators named in Count One engaged in a "single, illegal enterprise, with a common goal or

purpose or that their conduct was mutually supportive." Mot. for Judgment of Acquittal 4. Citing to the Tenth Circuit's decision in *Baldridge*, he contends that at most, the Government has attempted to prove a single conspiracy involving a common defendant, Pawlowski, rather than interdependence among all the co-conspirators. Because there was no evidence connecting the scheme in which Allinson was involved—offering campaign contributions in exchange for the award of legal services contracts—to the other pay-to-play schemes described in Count One, Allinson also argues a jury could not infer interdependence among his scheme and the others. He maintains that without a common goal, cooperation, and overlap among the alleged co-conspirators, his conspiracy conviction cannot stand.

Because Allinson makes a sufficiency of the evidence argument rather than a variance argument, his position lacks merit. The Third Circuit "distinguishes between challenges to the sufficiency of the evidence, in which the [defendant] claims that the [G]overnment failed to prove an essential element of conspiracy, and variance claims, in which the [defendant] argues that the [G]overnment proved multiple conspiracies instead of the one charged in the indictment." *Kemp*, 500 F.3d at 287 n.18; *see also United States v. Perez*, 280 F.3d 318, 342 (3d Cir. 2002) (separately considering sufficiency of the evidence and variance challenges to the same conspiracy conviction); *United States v. Kenny*, 462 F.2d 1205, 1216 (3d Cir. 1972) (explaining, before commencing a variance analysis, that the case was not one "where there was no evidence of the existence of a conspiracy"; rather, "the [G]overnment allegedly proved several separate unrelated conspiracies under each conspiracy count").

*Kotteakos* is a variance case, and the Third Circuit has applied it and *Kelly* in the variance context. *See, e.g.*, *Kemp*, 500 F.3d at 287-88 (citing *Kotteakos* and applying *Kelly* to hold that the evidence at trial established separate conspiracies rather than the single one alleged in the

18

indictment because "the [G]overnment failed to present evidence that some of the defendants knew or should have known about [other co-conspirators' activities], and the defendants' activities were neither "interdependent or mutually supportive," which would have served as evidence of a conspiratorial agreement under *Kelly*); *see also United States v. Camiel*, 689 F.2d 31, 35 (3d Cir. 1982) (noting "that in a conspiracy case, the determination of whether there is a variance sufficient to justify a trial judge's reversal of a jury conviction is controlled by the teachings of *Kotteakos*"). Allinson's reliance on *Kotteakos* and its progeny to make a sufficiency of the evidence argument is thus misplaced. Furthermore, Allinson's reliance on *Baldridge* is misguided, as the Tenth Circuit requires an additional element, interdependence, to prove conspiracy. Interdependence is not an element of the crime of conspiracy in the Third Circuit.

Whether a variance occurred at trial or the jury could find interdependence among all co-conspirators is not the question before the Court. The question is whether the Government offered sufficient evidence of all three elements of a conspiracy—an agreement to commit an unlawful objective, knowing and voluntary participation in the agreement, and an overt act in furtherance of the agreement—to prove that Allinson engaged in a conspiracy to commit federal program bribery. The answer is that it has. First, the jury could find that Allinson, Fleck, Ruchlewicz, and Pawlowski all had an agreement to exchange campaign contributions for legal contract work from the City of Allentown. Second, given the hours of recordings played for the jury in which Allinson speaks his "dialect of English" to Fleck and Ruchlewicz while discussing his willingness to contribute to Pawlowski in exchange for legal work, including the Parking Authority solicitorship, the jury could reasonably find that Allinson's involvement in this conspiracy was knowing and voluntary. Third, given that the jury found Allinson guilty of the substantive crime of federal program bribery, it is clear there was sufficient evidence from which

it could find overt acts in furtherance of the conspiracy, including meetings and phone calls with Ruchlewicz and Fleck where Allinson referenced raising money for Pawlowski in exchange for legal work such as the Parking Authority solicitorship and the $250 check Allinson gave Ruchlewicz at Pawlowski's Mardi Gras fundraiser with instructions that Ruchlewicz tell Pawlowski that he brought the check. Viewed in the light most favorable to the Government, the foregoing evidence is sufficient for the jury to have found beyond a reasonable doubt that Allinson knowingly joined an agreement to commit federal program bribery. Viewing the evidence independently, Allinson's argument pursuant to Rule 33 that the evidence does not show he was a part of the conspiracy charged in Count One is also unpersuasive to the Court for the reasons set forth above.

### C. Prejudicial Remarks During Government's Closing Argument

In his Rule 33 motion, Allinson additionally argues the Government's explanation of the quid pro quo standard to the jury during its closing argument was improper and incorrect, prejudicing him. At trial, the Government explained the quid pro quo standard as follows:

> The Court is not going to instruct you on some magic phrase that has to be said that turns it into an explicit quid pro quo. Why? Well, because frankly, few people are stupid enough to say that out loud. That's not the way the world works. That's not the way bribery happens. Bribery happens with a wink and a nod and sometimes a few words, an understanding between two people, we all know what's happening here. You're giving me this, I'm giving you that. You decide if there was an explicit quid pro quo on these bribery counts. You are the finders of fact. And that includes conversations where there's a discussion about contracts, and a few moments later, there's a discussion about campaign contributions. You decide if that was an explicit quid pro quo that both parties clearly understood. You decide, and again, considering the intent of the people, based on their words, based on their actions, based on their lack of action, based on the circumstances they were in . . . .

Trial Tr. Day 22 at 13, Feb. 27, 2018 (hereinafter Trial Tr. Day 22). Allinson objects to the Government's use of the "wink and a nod" phrase, taken from *Evans v. United States*, 504 U.S.

255, 274 (1992), which he characterizes as describing a lesser, implicit quid pro quo standard that applies only in the non-campaign contribution context. He contends the Government's deliberate attempt to have the jury apply this less demanding standard significantly influenced the guilty verdict in this case, particularly in light of evidence presented at trial suggesting the lack of an explicit quid pro quo: Allinson consistently refusing to contribute the amounts requested by Fleck and Ruchlewicz and the Norris McLaughlin attorneys' testimony that Allinson had nothing to do with their contributions to Pawlowski.

"In deciding whether the [Government] has improperly commented at trial, [a] court should look to the overall context of the statements in the trial record." *United States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir. 1999) (citing *United States v. Young*, 470 U.S. 1, 11 (1985)). If it has been determined that the Government's remarks were improper, the court will weigh the remarks under a harmless error standard. *See United States v. Zehrbach*, 47 F.3d 1252, 1264 (3d Cir. 1995); *see United States v. Wood*, 486 F.3d 781, 789 (3d Cir. 2007) ("[A] mistrial is not required where improper remarks were harmless, considering their scope, their relation to the context of the trial, the ameliorative effect of any curative instructions and the strength of the evidence supporting the conviction." (internal quotation marks and citation omitted)).

Here, when read in context, the Government's statement was not incorrect or misleading. Rather than informing the jury that a mere "wink and a nod" is enough to find an explicit quid pro quo between the parties, the Government invited the jury to consider all of the evidence presented—including the parties' words, their actions, their lack of action, and the surrounding circumstances—in determining whether there was an explicit quid pro quo. This explanation of the law was not improper or incorrect.

Moreover, Allinson's argument that the Government's use of the "wink and a nod" phrase is inconsistent with the explicit quid pro quo requirement, which all parties agree applies in this case, is unpersuasive. As previously noted, the explicit quid pro quo requirement derives from *McCormick*, in which the Supreme Court held that the exchange of campaign contributions for an official act constitutes extortion under color of official right only when made as part of an explicit quid pro quo agreement. 500 U.S. at 273. The Supreme Court, however, "failed to clarify what it meant by 'explicit,'" and "subsequent courts have struggled to pin down the definition of an explicit quid pro quo." *United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013). The Third Circuit has not had occasion to address what constitutes an explicit quid pro quo, as it has addressed the quid pro quo requirement only in the non-campaign contribution context. *See United States v. Salahuddin*, 765 F.3d 329, 343 (3d Cir. 2014); *United States v. Antico*, 275 F.3d 245, 260 (3d Cir. 2001); *United States v. Bradley*, 173 F.3d 225, 232 (3d Cir. 1999).

As Allinson notes, the "wink and a nod" phrase appears in Justice Kennedy's concurring opinion in *Evans v. United States*, 504 U.S. 255 (1992), a Supreme Court case decided shortly after *McCormick*. In *Evans*, an elected county official accepted unsolicited contributions of cash and a check payable to his campaign from undercover FBI agents in exchange for favorable zoning decisions. 504 U.S. at 257. The trial court instructed the jury that "if a public official demands or accepts money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution." *Id*. at 258. The county official argued that the jury instruction allowed the jury to convict based on passive acceptance; he also argued it did not properly describe the quid pro quo standard for campaign contributions.

*Id*. at 267.  The Supreme Court disagreed, holding that for a Hobbs Act extortion under color of official right conviction, inducement of the payment by a public official is not required.  *Id*. at 268.  It further held that extortion occurs when "the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the quid pro quo is not an element of the offense."  *Id*.

Justice Kennedy wrote a concurring opinion in *Evans* to explain that while he agreed with the quid pro quo standard set forth by the majority, he believed that the quid pro quo was in fact an element of the offense, "essential to a determination of those acts which are criminal and those which are not."  *Evans*, 504 U.S. at 272-73 (Kennedy, J., concurring).  Discussing the concept of quid pro quo generally, Justice Kennedy further explained, "The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.  The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it."  *Id*. at 274.

The Third Circuit has indeed suggested that *Evans* sets forth a lesser, implicit quid pro quo standard.  *See e.g.*, *Antico*, 275 F.3d at 257 (declining to apply an explicit quid pro quo requirement outside of the campaign contribution context); *Bradley*, 173 F.3d at 232 (same).  For example, in *Antico*, a case about an official in the Philadelphia Department of Licenses and Inspections who illegally demanded payment and other gifts from businesses to approve zoning permits and licenses, the official argued that the trial court should have charged the jury to find a specific quid pro quo for his extortion convictions.  275 F.3d at 256.  The Third Circuit disagreed, stating that in the non-campaign contribution context, the quid pro quo could be "implicit, that is, a conviction can occur if the Government shows that [the defendant] accepted

payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity under color of official right." 275 F.3d at 257 (internal quotation marks omitted). The Third Circuit characterized *Evans* as holding that "no 'official act' (i.e., no 'quo') need be proved to convict under the Hobbs Act. Nonetheless, the official must know that the payment—the 'quid'—was made in return for official acts." *Id*. And relying on that standard, the Third Circuit held that the district court did not err in instructing the jury: "If [the defendant] knew that payments or other consideration were extended to him to secure unwarranted favorable treatment in his official capacity, he is guilty of Hobbs Act extortion under color of official right without the need to prove that the official action (or inaction) occurred." *Id*. at 259. While the Third Circuit rejected the official's argument to apply *McCormick*'s explicit quid pro requirement to non-elected public employees outside the campaign contribution context and applied *Evans* in the non-campaign contribution context, its analysis does not illuminate the meaning of explicit or what form an explicit quid pro quo must take.

Citing to Justice Kennedy's concurrence in *Evans*, some courts have interpreted *McCormick*'s explicit quid pro quo standard by noting "explicit" is not interchangeable with "express," and have instead looked to the directness of the link between the quid and the quo or the degree of awareness of the exchange by the parties involved. *See Menendez*, 291 F. Supp. 3d at 624 (explaining what matters is not so much the form of the agreement between the payor and payee "but the degree to which the payor and the payee were aware of its terms."); *United States v. Terry*, 707 F.3d 607, 612-13 (6th Cir. 2013) (noting that "specific," "express," and "explicit" do not add a new element to the bribery statutes "but signal that the statutory requirement must be met," and "[a]s most bribery agreements will be oral and informal, the

question is one of inferences taken from what the participants say, mean and do, all matters that juries are fully equipped to assess"); *Siegelman*, 640 F.3d at 1172 ("an explicit agreement may be 'implied from [the official's] words and actions'" (quoting *Evans*, 504 U.S. at 274)); *Blandford*, 33 F.3d at 696 (explaining that *Evans* instructed that by 'explicit' *McCormick* did not mean 'express,'" and "[e]xplicit . . . speaks not to the form of the agreement between the payor and the payee, but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated")[9]; *Carpenter*, 961 F.2d at 827 (explaining that "what *McCormick* requires is that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain" and noting that to "read *McCormick* as imposing [a requirement that a defendant specifically state that he will exchange official action for a contribution] would allow officials to escape liability under the Hobbs Act with winks and nods, even when the evidence as a whole proves that there has been a meeting of the minds to exchange official action for money"); *see also United States v. Inzunza*, 638 F.3d 1006, 1014 (9th Cir. 2011) (noting that in the campaign contribution context, the connection between the explicit promise of official action and the contribution "may be circumstantial"). Thus, even in the campaign contribution context, a wink and a nod can constitute circumstantial evidence that supports the existence of an explicit quid pro quo. The Third Circuit has not held otherwise.

---

[9] The *Blandford* Court turned to dictionary definitions of "express" and "explicit" to demonstrate their differences. 33 F.3d at 696 n.13 (distinguishing the dictionary definitions of "explicit"— "[n]ot obscure or ambiguous, having no disguised meaning or reservation. *Clear in understanding*." and "express"—"*Clear . . . Declared in terms; set forth in words. Directly and distinctly stated. . . . Manifested by direct and appropriate language, as distinguished from that which is inferred from conduct*." (emphasis in original) (citing Black's Law Dictionary 579 (6th ed. 1990)). The Court notes that although the *Antico* Court referred to the *McCormick* standard as "overt" or "express" quid pro quo, it did so without analysis of the explicit quid pro quo requirement and outside of the campaign contribution context. *See Antico*, 275 F.3d at 257, 260.

To the extent the Government's statement on the law was inaccurate, any error was cured by the Court's instructions, which the jury is presumed to follow. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."); *United States v. Bryant*, 655 F.3d 232, 252 (3d Cir. 2011) ("[W]e generally presume that juries follow their instructions."). The Court informed the jury during preliminary instructions and again as part of the final charge that it is the Court's role to instruct the jury on the law, and it is the Court's instructions that the jury is bound to follow. *See* Jury Selection Tr. at 52, Jan. 16, 2018 ("[Y]ou must follow my instructions to keep an open mind and refrain from determining the guilt or the innocence of the defendants until you have heard all of the evidence on both sides, and further, until you have heard my instructions on the law to be applied to the facts."); *id*. at 65 ("The function of the jury is to decide the questions of fact, but when it comes to the law, however, you are to take the instructions from the Court, whether you agree with them or not."); Trial Tr. Day 23 at 7, Feb. 28, 2018 ("I will instruct you on the law. . . . My role now is to explain to you the legal principles that must guide you in your decisions. . . . You must not substitute or follow your own notion or opinion about what the law is or ought to be. You must apply the law that I give to you whether you agree with it or not."). The Government also informed the jurors that only the judge instructs them on the law. Trial Tr. Day 22 at 4-5 ("Additionally, the Judge is going to instruct you on the law after we've finished all of these arguments, and his instructions control. So while I might speak about the law or defense counsel might speak about the law, his instructions are the ones that you follow."). Given that both the Court and the Government informed the jury it was required to follow the Court's instructions on the law, to the extent the Government made any misstatements, the Court finds them to be cured. *See United States v. Bentley*, No. 10-525, 2015 WL 12743602, at *5 (E.D. Pa. June 10, 2015) (finding the court's

instructions to the jury before trial, before closing arguments, and in the final charge that its instructions on the law govern "certainly cured any error the [Government] committed"); *United States v. Williams*, 764 F. Supp. 1019, 1023 (E.D. Pa. 1991) (finding Government's alleged misstatements on the law during closing argument were harmless, "as the jury was instructed that [it] should rely on the law [given to it by the] district court," and the Government, during closing argument, stressed to the jury that the law as stated by the judge controls), *aff'd*, 952 F.2d 1394 (3d Cir. 1991).

### D. Constructive Amendment of the Indictment

Allinson's final argument in his Rule 33 motion is that the Government did not prove what it charged in Count Nineteen, resulting in a constructive amendment of the Indictment and/or a prejudicial variance. Because the Indictment charged Allinson with federal program bribery "in connection with the business, transaction, and series of transactions of the City of Allentown involving something of value of $5,000 or more, namely, legal services contracts *awarded* to [Norris McLaughlin]," Indict., Count Nineteen (emphasis added), Allinson contends the alleged quid pro quo involved only past legal contracts awarded to Allinson's firm. At trial, however, the Government argued the jury could convict Allinson even if no such work had been awarded to his firm, meaning the legal services contracts could have been prospective. Allinson asserts this broader theory of the crime was not charged in the Indictment.

A constructive amendment occurs "where a defendant is deprived of his 'substantial right to be tried only on charges presented in an indictment returned by a grand jury.'" *United States v. Syme*, 276 F.3d 131, 148 (3d Cir. 2002) (quoting *United States v. Miller*, 471 U.S. 130, 140 (1985)). "The key inquiry is whether the defendant was convicted of the same conduct for which he was indicted." *United States v. Daraio*, 445 F.3d 253, 260 (3d Cir. 2006) (internal quotation

marks and citation omitted). "An indictment is constructively amended when . . . the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *Id*. A variance occurs "when the evidence at the trial proves facts materially different from those alleged in the indictment." *United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010) (internal quotation marks and citation omitted). A variance constitutes reversible error only where "'it is likely to have surprised or has otherwise prejudiced the defense.'" *Id*. (quoting *Daraio*, 445 F.3d at 262).

Considering all of the language in Count Nineteen, there is no constructive amendment or variance present here. Count Nineteen reads in its entirety as follows:

> THE GRAND JURY FURTHER CHARGES THAT:
> 1. Paragraphs 1 to 30, 32 and 33, and Overt Acts 113 to 132 of Count One of this indictment are incorporated here.
> 2. From on or about February 2015 through on or about June 30, 2015, in Allentown, in the Eastern District of Pennsylvania, and elsewhere, defendant SCOTT ALLINSON corruptly gave, offered to give, agreed to give, caused, and attempted to cause others to give, something of value, that is, campaign contributions, to defendant EDWIN PAWLOWSKI and his political action committees, while PAWLOWSKI was the Mayor of Allentown and an agent of the City of Allentown, which received benefits in excess of $10,000 in the one-year period from January 1, 2015 to December 31, 2015, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance and other form of federal assistance, with intent to influence and reward defendant PAWLOWSKI in connection with the business, transaction, and series of transactions of the City of Allentown involving something of value of $5,000 or more, namely, legal services contracts awarded to Law Firm #2. All in violation of Title 18, United States Code, Section 666(a)(2).

Indict., Count Nineteen. The Count specifically incorporates Overt Acts 113 to 132—which include Allinson's interactions with Fleck and Ruchlewicz and describe Allinson discussing legal work to be given to Allinson's firm—evincing that anticipated legal work was part of the

offense. Count Nineteen also includes the language "with intent to influence" and "reward," further confirming the Indictment included both prospective and past legal work: Allinson "gave, offered to give, agreed to give, caused, and attempted to cause others to give . . . campaign contributions . . . with the intent to influence and reward defendant PAWLOWSKI in connection with the business . . . involving something of value of $5,000 or more, namely, legal services contracts awarded to [Norris McLaughlin]." *Id.* Reading the Indictment as a whole, it is clear that the "quo" in the quid pro quo is charged as both future and past legal work—i.e., Allinson is alleged to have intended to influence Pawlowski in connection with future legal work and reward him for past legal work. Because the charges of both future and past legal work were presented to the grand jury, and Allinson was convicted based on evidence of anticipated legal work and not on facts "materially different from those alleged in the [I]ndictment," no constructive amendment has occurred. *See Dario*, 445 F.3d at 260. The evidence at trial of prospective legal work was not materially different from the facts alleged in the Indictment; thus, no variance has occurred. In addition, because the anticipated legal work was referenced in the Indictment, there is no evidence that is "likely to have surprised or otherwise prejudiced" Allinson in the preparation of his defense. *See Vosburgh*, 602 F.3d at 532.

For all of the foregoing reasons, this Court denied Allinson's post-verdict motions.

BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, J.